ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
APR 14 2015
U.S. COURT OF FEDERAL CLAIMS

GLOBAL FREIGHT SYSTEMS CO. W.L.L.
Block 19 Area Dajeej Sultan Ben Essa
Office Complex South Farwaniya
Kuwait

Plaintiff

v.

DEPARTMENT OF DEFENSE

and the

DEPARTMENT OF THE NAVY

Defendants.

Case No. 15-378 C

## COMPLAINT

1. This is a civil action brought by Plaintiff, Global Freight Systems Co. W.L.L. ("GFS"), a corporation organized under the laws of Kuwait. Plaintiff owns several vehicles that it had used on a United States naval base, Camp Lemonnier, in the Republic of Djibouti ("Djibouti") during its performance of subcontracts with U.S. government contractors.

2. Between February and April of 2014, the United States Department of the Navy (the "Navy") unlawfully directed and cooperated in the confiscation of Plaintiff's vehicles under false pretenses. Through its actions, the Navy violated the Takings Clause of the Fifth Amendment of the United States Constitution by not paying reasonable and just compensation to GFS for its taking of Plaintiff's property. Alternatively, if this Court finds the Takings Clause inapplicable, the Navy has taken Plaintiff's personal property in violation of the Agreement Between the United States of America and the Government of the Republic of Djibouti on Access to and Use

of Facilities in the Republic of Djibouti dated February 19, 2003 (the "Base Access Agreement"). The Base Access Agreement is attached as Exhibit ("Ex.") 1.

## JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1491(a)(1). A cause of action exists under the Fifth Amendment to the Constitution of the United States. Because Kuwait accords citizens of the United States the right to prosecute claims against the government of Kuwait in Kuwaiti courts, this Court is not deprived of jurisdiction by 28 U.S.C. § 2502(a).

4. Alternatively, the Court has subject matter jurisdiction over this civil action pursuant to the Base Access Agreement between the United States and Djibouti, which provides that

> Claims by a third party arising out of the acts or omissions of any U.S. personnel may, at the discretion of the USG [United States Government], be dealt with and settled by the USG.

Ex. 1 at 5.

## PARTIES

5. Plaintiff is a corporation organized under the laws of Kuwait, with its principal place of business in Kuwait, and with operations in Kuwait, Iraq, Dubai, Afghanistan, and Djibouti.

6. In addition to the contracts described herein, GFS has an existing business relationship with the United States. GFS has served as a contractor or subcontractor on numerous contracts with the United States Government in Africa and the Middle East. Since 2003, GFS has been actively involved in U.S. military contracting activities in Kuwait, Iraq, and Afghanistan. For example:

a. GFS performed under a theater-wide containerized housing units multiple award indefinite-delivery indefinite-quantity contract the construction and installation of

living and office units for the Joint Contracting Command Iraq/Afghanistan pursuant to its prime Contract No. W91GDW-07-D-0004.

b. GFS provided living units and office works in Iraq and fabricated and supplied Ablution units pursuant to its Contract No. C2TC-171-N-I-95470 with Fluor Intercontinental, Inc. at Camp Shield Iraq.

c. GFS provided freight forwarding, customs clearance and delivery services to the United States Government under prime contract number W91GY0-10-C-0013 at Camp Victory Baghdad, Baghdad International Airport, and Sather Air base in Iraq.

d. In Afghanistan, GFS provided laundry shower, ablution units under prime contract number W90U42-09-D-005, a theater-wide multiple award indefinite-delivery indefinite-quantity contract.

e. GFS served as the preferred bulk fuel supplier and transporter for Kellogg Brown & Root Services, Inc. ("KBR"), the United States Department of State, and the United States Mission, Iraq ("USMI") under Contracts No. DAAA09-02-D-0007 and No. W91GY0-09-A-0020.

f. GFS served as a subcontractor to Parsons Infrastructure & Technology Group, Inc. ("Parsons") in support of Prime Contract No. W912DY-04-D-005 with the United States Army Corps of Engineers, Huntsville Support Center. GFS deployed over 300 assets on this project each month during the period of performance from March 2006 to December 2008.

g. GFS served as a prime contractor to the Regional Contracting Center, Baghdad under Contract No. W91GFS-07-A-5035-BPA.

7. GFS has received numerous commendations for its work in support of the United States Government, including from Headquarters of the United States Forces-Iraq, the U.S. Army, and the U.S. Embassy in Kuwait. A sample of those commendations is attached as Exhibit 2.

8. The Department of Defense (the "DoD") is a department of the United States Government. The Navy is a department of the United States Government within the DoD.

## FACTUAL BACKGROUND

9. Between February of 2011 and June of 2013, GFS entered into a series of subcontracts with PAE, Inc. ("PAE") under PAE's Prime Contract No. N33191-07-D-0207 with the United States Government for base operation and support for Camp Lemonnier in Djibouti:

a. Subcontract No. PAE-DJ-0298-MG-0001, Lease of (2) 3000-5000 Gallon Diesel Fuel Trucks (Ex. 3a);

b. Subcontract No. PAE-DJ-2092-MG-0002, Provide Two (2) 5-Ton Forklifts, Diesel (Ex. 3b);

c. Subcontract No. PAE-DJ-2091-JM-0002, Lease of Three (3) 3,000-5,000 Gallon Diesel Fuel Trucks & Four (4) 40,000-50,000 Liter Diesel/Jet Fuel Trucks (Ex. 3c);

d. Subcontract No. PAE-DJ-2092-MG-0003, Lease of (2) 11 Passenger Vans & (1) 3-Seat Cargo Van (Ex. 3d); and

e. Subcontract No. PAE-DJ-2091-JM-0001, Sludge & Grease Removal (Ex. 3e)

Generally, these subcontracts required GFS to "furnish all necessary personnel, labor, facilities, equipment, materials, and supplies in coordination and under the administrative supervision of [PAE] to provide operational and repair services and maintenance in support of the [] prime contract."

10. On March 14, 2013, PAE issued Purchase Order No. 25011128 for vehicle leases to GFS under PAE's Prime Contract No. N33191-12-D-0407 (Ex. 3f). On October 8, 2013, PAE and GFS entered into an additional subcontract lease agreement for similar services, PAE-JM-3281-MG-0002 (Ex. 3g), pursuant to PAE's Prime Contract No. N33191-12-D-0639. PAE's prime contracts with the U.S. Government are referred to collectively herein as the "PAE Prime Contracts," and the subcontracts between PAE and GFS are referred to collectively herein as the "PAE Subcontracts."

11. All work under the PAE Subcontracts was to be performed at Camp Lemonnier in Djibouti.

12. Sovereignty on Camp Lemonnier is governed by the Base Access Agreement, which provides that "U.S. personnel and U.S. contractors and vehicles, vessels, and aircraft operated by or for U.S. forces may use and have unimpeded access to these facilities and areas for training, transit, support and related activities, refueling of aircraft, maintenance of vehicles, vessels and aircraft, accommodation of personnel, communications, staging of forces and materiel, and for such other purposes or activities as the Parties or their Executive Agents may agree." Ex. 1 at 2. Further, "[a]ircraft, vessels and vehicles operated by or for U.S. forces may enter, exit, and move freely within the Republic of Djibouti." *Id.* at 5.

13. The Base Access Agreement further provides that "[t]he importation and re-exportation of any articles brought into the Republic of Djibouti, in accordance with this Agreement, shall not be subject to any taxes, customs, duties, license, or other restrictions by the Government of Djibouti or its instrumentalities." *Id.* at 4. Additionally, "[t]he U.S. forces, U.S. personnel, U.S. contractors and their employees shall retain title to all removable property that they have imported into or acquired while in the territory of the Republic of Djibouti. Such property may

be removed from the Republic of Djibouti or disposed of therein provided the disposition of such property in the Republic of Djibouti to persons or entities not entitled to exemption from applicable taxes and duties may be subject to payment of such taxes and duties by such persons or entities." *Id.* at 5.

14. Pursuant to its performance under the PAE Subcontracts, during the period from March 2011 to June 2013, GFS imported twenty-two (22) vehicles to Djibouti for use at Camp Lemonnier, including forklifts, vans, and trucks. Twenty-one (21) of these vehicles were imported with Tax Exoneration Letters issued by Djiboutian customs, and thus no duties were paid. A representative sample of these Tax Exoneration Letters is attached as Exhibit 4. One (1) of the imported vehicles did not have a duty exemption, and GFS paid the required duty to Djiboutian customs for this vehicle.

15. On June 12, 2012, GFS sold one (1) forklift imported pursuant to the PAE Subcontracts to a local Djiboutian company in accordance with the Base Access Agreement.

16. On December 6, 2012, GFS sold one (1) tractor with tanker imported pursuant to the PAE Subcontracts to a local resident of Djibouti in accordance with the Base Access Agreement.

17. On June 20, 2013, the PAE Prime Contract expired, and was replaced with a new Master Agreement for Camp Lemonnier base operation support services between the United States and KBR, Contract N62470-13-D-3008 (the "KBR Prime Contract").

18. Pursuant to the KBR Prime Contract (which became effective the next day), KBR entered into Subcontract SUD0429 with GFS on June 19, 2013, under which GFS would provide leased vehicles and related services at Camp Lemonnier. On June 30, 2013, KBR issued an additional subcontract to GFS, MADX143. Then, on October 18, 2013, KBR issued MADX145 to replace

SUD0429. These subcontracts are collectively referred to herein as the "KBR Subcontracts" and copies of MADX143 and MADX145 are attached as Exhibits 5a and 5b.

19. Between June 20, 2013 and January 2014, GFS imported nine (9) additional vehicles for use at Camp Lemonnier pursuant to its performance under the KBR Subcontracts. Notwithstanding the fact that the Base Access Agreement provided that "[t]he importation and re-exportation of any articles brought into the Republic of Djibouti, in accordance with this Agreement, shall not be subject to any taxes, customs, duties, license, or other restrictions by the Government of Djibouti or its instrumentalities" (Base Access Agreement at 4), GFS paid duty to Djiboutian customs on these nine (9) vehicles.

20. GFS properly imported all thirty-one (31) vehicles that it brought onto Camp Lemonnier under the Base Access Agreement, the PAE Prime Contracts, the KBR Prime Contract, the PAE Subcontracts, and the KBR Subcontracts. GFS paid a duty to the Djiboutian government for ten (10) of these vehicles, and the remaining twenty-one (21) vehicles were exempted from duties and taxes pursuant to the Base Access Agreement and Tax Exoneration Letters issued by Djiboutian customs.

21. During the period between February 17, 2014 and April 10, 2014, the Djiboutian police seized twenty-nine (29) of the vehicles owned by GFS that were being used inside Camp Lemonnier (all but the two vehicles that were sold) under the pretext that customs duties had not been paid at the time the vehicles were imported into Djibouti.

22. Djiboutian customs officials and Gendarmerie raided GFS's villa outside Camp Lemonnier and forcibly seized eight (8) GFS-owned vehicles. The remaining twenty-one (21) vehicles owned and properly imported by GFS were seized by Djiboutian officials on March 1, March 11 and April 10, 2014. This taking was made possible, by and through the Navy's

express direction that GFS move the vehicles from the protected confines of Camp Lemonnier to Djiboutian jurisdiction. A series of contemporaneous emails confirming this direction are attached as Exhibits 6a, 6b, 6c, and 6d.

23. The vehicles were not taken pursuant to a military emergency, military necessity, or act of battle. Rather, they were unlawfully taken by the Djiboutian government in violation of an agreement with the United States Government, which in part, expressly protected contractors from such action. Moreover, this action was only accomplished due to the Navy's direct and substantial involvement, because but for the Navy's direction the vehicles would have remained on Camp Lemonnier free from the unwarranted seizure by the Djiboutian authorities. Thus, the Navy's explicit and express involvement and direction to make these vehicles available to Djiboutian authorities, without due process or an opportunity to address the allegations regarding GFS's purported failure to pay the identified duty, if any, constitutes a taking by the Navy itself.

24. One of the confiscated vehicles, a Nissan truck with VIN JN6DD23Y38X044027 and TAG-504D56, was subsequently returned to GFS for use in commuting in and around the town beside Camp Lemonnier.

25. The remaining twenty-eight (28) confiscated vehicles were ultimately returned to GFS (on January 26, 2015). However, by taking the vehicles, the Navy deprived GFS of its ability to perform under the PAE and KBR subcontracts (which were subsequently terminated) and the going concern of such vehicles.

26. GFS has suffered numerous and significant losses as a result of the Navy's actions. GFS has not received compensation from the Navy or any other representative of the United States Government for the taking of GFS's vehicles. Furthermore, GFS's subcontracts with PAE and

KBR were terminated as a result of the improper actions of the Navy. The goodwill and going-concern value of GFS's business have also been negatively impacted by the Navy's action.

27. GFS has attempted to resolve this matter through the Djiboutian judicial system and through attempted contact with the Ministry of Justice and Penal Affairs in Djibouti, the Embassy of Djibouti, as well as the U.S. State Department and the Navy. Ultimately, due to its own efforts, GFS reach an agreement with The Management of Djibouti's Customs and Indirect Duties to recover the confiscated vehicles. Exhibits 7a (French Version) and 7b (English Version).

28. The agreement, effective January 12, 2015, provided for the return of the wrongfully taken vehicles, which GFS accepted under duress, and required GFS to pay The Management of Djibouti's Customs and Indirect Duties twenty five million Djibouti Currency.

**COUNT I**
**(For Violation of the Takings Clause of the Fifth Amendment to the United States Constitution)**

29. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 to 28, as if fully repeated herein.

30. The Takings Clause of the Fifth Amendment to the United States Constitution states that no private property may "be taken for public use, without just compensation."

31. The Navy has effectuated a taking of Plaintiff's vehicles by the Djiboutian government. The Navy is thus liable to Plaintiff under the Takings Clause and is obligated to pay just compensation.

**COUNT II**
**(For breach of the Base Access Agreement between the United States and Djibouti)**

32. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 to 28, as if fully repeated herein.

33. If the Court finds that the Takings Clause of the U.S. Constitution is inapplicable, then the unauthorized and uncompensated appropriation of Plaintiff's personal property constitutes a conversion in violation of the Base Access Agreement.

34. The Base Access Agreement provides that "[c]laims by a third party arising out of the acts or omissions of any U.S. personnel may, at the discretion of the USG [United States Government], be dealt with and settled by the USG." Base Access Agreement at 5.

**COUNT III**

**(GFS is an intended Third-Party Beneficiary to the Agreement Such that the U.S. Government's and Djiboutian Government's Failure to Honor the Terms of the Agreement Entitles GSA to Monetary Damages Under the Contract)**

35. GFS incorporates the allegations in paragraphs 1 to 28, as if fully set forth herein.

36. To find that a party is entitled to third-party beneficiary status, a contract must expressly or impliedly provide for the intention of the contracting parties to benefit the third-party.

37. The Access Agreement expressly defined "United States contractors," such as GFS, as "companies and firms **and their employees under contract with the United States Government in connection with activities under the Agreement**." (Emphasis added)

38. Due to "the need to enhance their common security, to contribute to the international peace and stability," Article X ¶ 4 of the Agreement provided that the "U.S. contractors and their employees shall retain title to all removable property that they have imported into or acquired while in the territory of the Republic of Djibouti." The Access Agreement further provided that "vehicles operated by or for U.S. forces may enter, exit, and move freely within the territory of the Republic of Djibouti."

39. The right to retain all removable property that had been imported into or acquired by GFS while in Djibouti as well as the guarantee of free movement within Djibouti conferred a benefit on GFS as a "United States Contractor."

40. Through its seizure of the vehicles owned and imported by GFS, the Djiboutian government affirmatively violated the terms of the Access Agreement.

41. Pursuant to Article XIX of the Access Agreement, any dispute in connection with the "application, implementation or interpretation of [the Access Agreement] . . . shall be resolved by consultation between [the United States and Republic of Djibouti] or their Executive Agents, including, as necessary, through diplomatic channels, and will not be referred to . . . any third party for settlement."

42. The Navy, despite its knowledge of the protections afforded U.S. contractors under the Access Agreement, directed GFS to move the vehicles from the protected confines of Camp Lemonnier to Djiboutian jurisdiction which resulted in the confiscation of the vehicles by the Djiboutian government.

43. The Navy's direction to move the vehicles as well as its failure to invoke the disputes mechanism or otherwise engage the Djiboutian government in accordance with the Access Agreement caused GFS to suffer a significant loss of property for which the Navy has not compensated GFS.

**PRAYER FOR RELIEF**

WHEREFORE, based on the allegations set forth above, Plaintiff hereby seeks:

44. Compensation in an amount to be determined at trial, payable in U.S. dollars, for the taking of Plaintiff's personal property.

45. Interest from the date of the taking;

46. Reasonable attorneys' fees and costs of this action; and

47. Such other and further relief as the Court may deem just and proper.

Dated: April 14, 2015

Respectfully submitted,

Paul A. Debolt
Dismas N. Locaria
Nathaniel S. Canfield
VENABLE LLP
575 7th Street, N.W.
Washington, DC 20004-1601
Telephone: (202) 344-4000
Facsimile: (202) 344-8300
*Counsel for Global Freight Systems Co. W.L.L.*

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

GLOBAL FREIGHT SYSTEMS COMPANY
Block 19 Area Dajeej Sultan Ben Essa
Office Complex South Farwaniya
Kuwait

Plaintiff

v.

DEPARTMENT OF DEFENSE

and the

DEPARTMENT OF THE NAVY

Defendants.

Case No. ____________

**INDEX OF EXHIBITS TO COMPLAINT**

Exhibit 1 – Base Access Agreement

Exhibit 2 – U.S. Government Commendations

Exhibit 3a – Subcontract No. PAE-DJ-0298-MG-0001

Exhibit 3b – Subcontract No. PAE-DJ-2092-MG-0002

Exhibit 3c – Subcontract No. PAE-DJ-2091-JM-0002

Exhibit 3d – Subcontract No. PAE-DJ-2092-MG-0003

Exhibit 3e – Subcontract No. PAE-DJ-2091-JM-0001

Exhibit 3f – Purchase Order No. 25011128

Exhibit 3g – Subcontract No. PAE-JM-3281-MG-0002

Exhibit 4 – Tax Exoneration Letters

Exhibit 5a – Subcontract No. MADX143

Exhibit 5b – Subcontract No. MADX145

Exhibit 6a – A. Faria Email, dated Feb. 26, 2014

Exhibit 6b – S. Nair Email, dated Mar. 9, 2014

Exhibit 6c – S. Nair Email, dated Apr. 8, 2014

Exhibit 6d – M. Green Email, dated Mar. 1, 2014

Exhibit 7a – Settlement Agreement (French Version)

Exhibit 7b – Settlement Agreement (English Version)