# In the United States Court of Federal Claims

**No. 15-378C**
**(Filed: February 28, 2017)**[1]

* * * * * * * * * * * * * * * * * * * * * * * * * *

**GLOBAL FREIGHT SYSTEMS CO. W.L.L.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

* * * * * * * * * * * * * * * * * * * * * * * * * *

**Fifth Amendment Taking; Breach of Contract; Third-Party Beneficiary; 28 U.S.C. § 1502; Discovery.**

Paul A. Debolt, Dismas N. Locaria, and Nathaniel S. Canfield, Venable LLP, 575 7th Street, N.W., Washington, D.C. 20004-1601, for Plaintiff.

Benjamin C. Mizer, Robert E. Kirschman, Jr., Douglas K. Mickle, Scott A. MacGriff, and Renée A. Burbank, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480 Ben Franklin Station, Washington, D.C. 20044, for Defendant.

---

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

---

**WILLIAMS**, Judge.

Plaintiff, Global Freight Systems Co. W.L.L. ("Global Freight"), was a subcontractor providing services on a Navy base in Djibouti, Africa between 2011 and 2014. Plaintiff claims that between February and April 2014, the Navy effected a Fifth Amendment taking of its property

[1] On November 30, 2016, the Court issued this opinion under seal and directed the parties to file any proposed redactions by December 21, 2016. Plaintiff proposed limited redactions of information contained in nonparty emails containing proprietary legends. Defendant objected to Plaintiff's proposed redactions. On February 14, 2017, Plaintiff notified the Court that the nonparty had no objection to the public release of any material in this opinion. As such, the Court reissues this opinion without redactions.

by directing Plaintiff to move its vehicles from the protected confines of Camp Lemonnier – the Navy base – into Djiboutian jurisdiction, thereby enabling the Djiboutian Government to seize Plaintiff's vehicles. Plaintiff alleges that Defendant took this action with the knowledge that "Djiboutian officials had been actively disrupting the work of numerous contractors that were supporting the Navy's mission at Camp Lemonnier." Second Am. Compl. ¶¶ 38-42.

Alternatively, Plaintiff alleges that by engaging in this same conduct the Navy breached its Prime Contract with Kellogg Brown & Root Services, Inc. ("KBR"). Plaintiff claims it was a third-party beneficiary of the KBR Prime Contract and that this Contract afforded Plaintiff protections of the United States Government's Base Access Agreement with Djibouti. Plaintiff alleges that the Navy's directive to move the vehicles outside Camp Lemonnier and its failure to invoke the disputes mechanism of the Base Access Agreement constituted a breach of contract. Id. at 54.

This matter comes before the Court on Defendant's motion to dismiss Plaintiff's second amended complaint.[2] Defendant asserts that Plaintiff has failed to state a cognizable takings claim, that this Court lacks jurisdiction over Plaintiff's contract claim, and that Plaintiff has failed to sufficiently allege its third-party beneficiary status.

For the reasons stated below, Defendant's motion to dismiss Plaintiff's second amended complaint is **DENIED**.

## Background[3]

Camp Lemonnier, the only official and permanent United States naval base in Africa, is located in Djibouti. Second Am. Compl. Ex. 6a. Camp Lemonnier "serves as the headquarters of Combined Joint Task Force-Horn of Africa, which is focused on countering violent extremists in Somalia and around the Horn of Africa" and has been the "launcshing site for key elements of the Obama Administration's counterterrorism strategy in East Africa and Yemen." Id. at Exs. 6a, 6c. The base supports approximately 4,000 United States and allied military and civilian personnel as well as an additional 1,100 local and third country nationals. Id. at Ex. 6a.

Between 2011 and 2014, Plaintiff served as a subcontractor providing base operation and support services on Camp Lemonnier. Id. at ¶¶ 11, 25, 38. Initially, Plaintiff provided

---

[2] On October 13, 2015, Defendant filed a motion to dismiss Plaintiff's amended complaint. ECF No. 17. The Court deferred consideration of this motion pending further development of the record. On June 13, 2016, following Plaintiff's receipt of complete copies of the pertinent prime contracts, Plaintiff filed its second amended complaint. ECF No. 29. The counts in Plaintiff's amended complaint and second amended complaint are identical, and Plaintiff's second amended complaint amplifies its discussion of relevant provisions of the KBR prime contract. The parties agreed that Defendant's pending motion to dismiss should be deemed to address Plaintiff's second amended complaint. Briefing on this motion was completed on August 15, 2016.

[3] This background is derived from Plaintiff's second amended complaint and Exhibits A, B and C to Defendant's Proposed Findings of Fact and Conclusions of Law Related to Defendant's Motion to Dismiss Plaintiff's Amended Complaint.

subcontractor services to PAE, Inc., ("PAE"), and upon expiration of PAE's contract, to KBR. Id. at ¶ 25.

**Base Access Agreement**

For the time period relevant to this dispute, the "Agreement Between the Government of the United States of America and the Government of the Republic of Djibouti On Access to and Use of Facilities in the Republic of Djibouti" ("Base Access Agreement") governed the sovereignty of each country on Camp Lemonnier. Id. at ¶ 14, Ex. 1. The Base Access Agreement provided the terms and conditions for the movement of U.S. personnel, contractors and property operated by or for U.S. forces into and out of Camp Lemonnier and Djibouti and set forth dispute resolution procedures between the United States and Djibouti. Id. at Ex. 1. Both the PAE and KBR Prime contracts contained references to the Base Access Agreement.

The Base Access Agreement included a provision regarding general access to and use of Camp Lemonnier and other facilities in Djibouti:

> The Government of the United States of America . . . is authorized access to and use of Camp Lemonnier and such other facilities and areas in the Republic of Djibouti as may be mutually agreed. Such access and use will be through procedures mutually agreed by the Executive Agents of the Parties. U.S. personnel and U.S. contractors and vehicles, vessels, and aircraft operated by or for U.S. forces may use and have unimpeded access to these facilities and areas for training, transit, support and related activities, refueling of aircraft, maintenance of vehicles, vessels and aircraft, accommodation of personnel, communications, staging of forces and materiel, and for such other purposes or activities as the Parties or their Executive Agents may agree.

Id.

The Base Access Agreement included the following pertinent provisions related to taxation:

> 1. The Government of the Republic of Djibouti shall exempt from taxation any income received from the United States or from sources outside the Republic of Djibouti by U.S. personnel and by U.S. contractors and contractor employees, other than nationals of the Republic of Djibouti.
>
> 2. Articles and services acquired in the Republic of Djibouti by or on behalf of U.S. personnel shall not be subject to any taxes or similar charges by the Government of the Republic of Djibouti or its instrumentalities.
>
> 3. U.S. personnel, U.S. contractors and their employees, other than nationals of the Republic of Djibouti, shall not be liable to pay any tax or similar charges on the ownership, possession, use or transfer amongst themselves on their tangible movable property imported into the Republic of Djibouti or acquired while in the territory of Djibouti for personal use during the term of this Agreement.

Id.

The Base Access Agreement also addressed the import/export of equipment, supplies, material, or services as follows:

> 1. The U.S. forces and U.S. contractors may import into the Republic of Djibouti any equipment, supplies, material or services required for their operations in the Republic of Djibouti.
>
> * * *
>
> 3. The importation and re-exportation of any articles brought into the Republic of Djibouti, in accordance with this Agreement, shall not be subject to any taxes, customs, duties, license, or other restrictions by the Government of Djibouti or its instrumentalities.
>
> 4. The U.S. forces, U.S. personnel, U.S. contractors and their employees shall retain title to all removable property that they have imported into or acquired while in the territory of the Republic of Djibouti . . . .

Id.

The Base Access Agreement also governed the movement of aircraft, vessels, and vehicles within Djibouti:

> 1. Aircraft, vessels and vehicles operated by or for U.S. forces may enter, exit, and move freely within the territory of the Republic of Djibouti.
>
> 2. The access and movement of such aircraft, vessels, and vehicles shall be free of landing and parking fees, port, pilotage, navigation and overflight charges, tolls, overland transit fees and similar charges while in the Republic of Djibouti; however U.S. forces will pay reasonable charges for services requested and received. Such aircraft, vessels and vehicles shall be free from inspection.

Id.

Finally, the Base Access Agreement contained a dispute resolution clause, stating:

> Any dispute that may arise from the application, implementation or interpretation of [the Base Access] Agreement shall be resolved by consultation between [the United States and Republic of Djibouti] or their Executive Agents, including, as necessary, through diplomatic channels, and will not be referred to any national or international tribunal or any third party for settlement.

Id.

**PAE Subcontracts**

Between February 2011 and June 2013, Global Freight entered into a series of subcontracts with PAE under PAE's Prime Contract with the Navy for base operations and support on Camp

Lemonnier. Pursuant to its subcontracts with PAE, Global Freight furnished "all necessary personnel, labor, facilities, equipment, materials, and supplies in coordination and under the administrative supervision of [PAE] to provide operational and repair services and maintenance in support of the [] prime contract." Id. at ¶ 11 (alterations in original) (internal quotation marks omitted). The Base Access Agreement was incorporated into Section J – the Performance of Work Statement of the PAE Prime Contract. Id. at ¶ 18; see also Def.'s Proposed Findings Ex. B, at PAE000197.

On March 14, 2013, pursuant to its Prime Contract, PAE issued Global Freight Purchase Order No. 25011128 for the lease of vehicles. Second Am. Compl. ¶ 12. Pursuant to another PAE Prime Contract, PAE and Global Freight entered into another subcontract lease agreement, on October 8, 2013, for similar services.[4] Id. These PAE subcontracts did not refer to the Base Access Agreement.

Between March 2011 and June 2013, Global Freight imported 22 vehicles into Djibouti, including forklifts, vans, and trucks, for use at Camp Lemonnier pursuant to the PAE Subcontracts. Id. at ¶ 21. Global Freight imported 21 of these vehicles without paying duties, as the vehicles were imported with "Tax Exoneration Letters" issued by the Navy and accepted by Djiboutian customs. Id. at Ex. 4. Global Freight paid the Djiboutian General Directorate of Customs and Excise the required duty for the remaining vehicle that did not have a duty exemption. Id. at ¶ 22.

On June 12, 2012, and December 6, 2012, respectively, Global Freight sold one imported forklift and one imported tractor with tanker to a local Djiboutian resident. Id. at ¶¶ 23-24. According to Plaintiff, both sales were made in accordance with the Base Access Agreement's provision that United States contractors "shall not be liable to pay any tax or similar charges on the . . . transfer amongst themselves on their tangible movable property imported into the Republic of Djibouti or acquired while in the territory of Djibouti for personal use during the term of this Agreement." Id. at Ex. 1.

**KBR Prime Contract**

Following the expiration of the PAE Prime Contract, the United States Government on June 20, 2013, entered into a new contract with KBR for base operation and support services at Camp Lemonnier (the "KBR Prime Contract"). The KBR Prime Contract contained references to the contractor's obligations related to its use of subcontractors. In particular, the Prime Contract noted that "the contractor is responsible for performance of all contractor requirements to include those performed by its subcontractors." Def.'s Proposed Findings Ex. A, at A113, A161-63.

In addition, the KBR Prime Contract incorporated the questions and answers between the Navy and potential offerors during the procurement process that resulted in KBR's award of the Prime Contract. The KBR Prime Contract incorporated by reference FAR 52.229-6, "Taxes –

[4] PAE's prime contracts with the U.S. Government are referred to collectively as the "PAE Prime Contracts," and the subcontracts between PAE and Global Freight are referred to collectively as the "PAE Subcontracts."

Foreign Fixed Price Contracts – June 2003," governing contracts involving the furnishing of supplies or performance of services outside of the United States, stating in pertinent part:

> (c) (1) Unless otherwise provided in this contract, the contract price includes all applicable taxes and duties, except taxes and duties that the Government of the United States and the government of the country concerned have agreed shall not be applicable to expenditures in such country by or on behalf of the United States.

Id. at A155; 48 C.F.R. § 52.229-6(c)(1) (2013).

The following questions related to provisions of the Base Access Agreement, regarding the contractor's obligations to pay taxes:

> **Question:** Clause 52.229-6, Taxes – Foreign Fixed-Price Contracts.[5] The Agreement between the Governments of the US & Republic of Djibouti dated 19 Feb [2003] provides for no taxes of USG contractor or their employees. What, if any, are the taxes levied by the government of Djibouti and its political subdivisions upon any aspect of DOD support contracts? Are there any supplemental agreements to the 19 Feb 2003 agreement?
>
> **Answer:** The Government of Djibouti does not charge foreign USG contractors (or contractor employees) income tax. Some local vendors sell products with a 7.5% value added tax (VAT). There are no supplemental agreements to the 19 Feb 2003 agreement that are relevant to BOS contractors.

Def.'s Proposed Findings Ex. A, at A8.

> **Question:** Please identify all Djiboutian tax/withholding requirements such as corporate and personal income, Local National social security and any others that will apply to the Prime and/or Subcontractors.
>
> **Answer:** There are no supplemental agreements to the 19 Feb 2003 agreement that are relevant to BOS contractors.

Id. at A126.

The KBR Prime Contract incorporated by reference FAR 52.225-19(d)(1) and DFARS Clause 252.225-7040. FAR 52.225-19(d)(1), "Contractor Personnel in a Designated Operational Area or Supporting a Diplomatic or Consular Mission Outside the United States" provides:

> (d) Compliance with laws and regulations. The Contractor shall comply with, and shall ensure that its personnel in the designated operational area or supporting the diplomatic or consular mission are familiar with and comply with, all applicable – (1) United States, host country, and third country national laws.

---

5 The KBR Prime Contract incorporated FAR Clause 52.229-6 by reference.

Id. A155; 48 C.F.R. § 52.225-19(d)(1) (2008). DFARS Clause 252.225-7040 contains substantially identical requirements. Def.'s Proposed Findings Ex. A, at A153; 48 C.F.R. § 252.225 – 7040(d)(1)(i) (2015).

FAR 52.229-6, further provides that the contract price would be increased in the event the contractor, through no fault of its own, was obligated to pay taxes specifically excluded from the contract price, or decreased to reflect any tax relief received by the contractor, and that the contractor was required to take reasonable action to seek exemption from or refund of any taxes "which the governments of the United States and of the country concerned have agreed shall not be applicable to expenditures in such country by or on behalf of the United States." 48 C.F.R. § 52.229-6(d)(1),(e),(i).

On June 19, 2013, pursuant to the KBR Prime Contract, KBR entered into the SUD0429 Subcontract with Global Freight. Second Am. Compl. ¶ 29. On June 30, 2013, KBR and Global Freight entered into another subcontract, MADX143. Id. Under the MADX143 Subcontract, Global Freight was to provide leased vehicles and related services to KBR at Camp Lemonnier for a base period from June 30, 2013 through June 19, 2014. Id. at Ex. 5a. The MADX143 Subcontract also anticipated three option periods, potentially extending the subcontract to June 19, 2017. Id. This Subcontract provided that Global Freight was "[i]n accordance with the [General Contractor's] instructions and the Sublet Work, . . . [to] furnish all labor, equipment, materials, supervision, insurance, freight, overhead and all other services necessary to provide Vehicle Leasing Services for KBR Security Department." Id. On October 18, 2013, KBR issued MADX145, replacing Global Freight's initial KBR subcontract, SUD0429. Id.[6]

Under the KBR Subcontracts, between June 20, 2013 and January 2014, Global Freight imported nine vehicles for use at Camp Lemonnier and "paid duty to Djiboutian customs on these nine (9) vehicles." Id. at ¶ 32.

**Seizure of Global Freight's Vehicles by the Djiboutian Government**

Between February 17, 2014 and April 10, 2014, the United States Government and the Djiboutian Government were negotiating the terms of a new Base Access Agreement, which would eventually include an increase in the United States Government's annual lease payment. Id.

While negotiations for a new Base Access Agreement were ongoing, Djiboutian customs officials seized 29 of Global Freight's vehicles as part of a customs enforcement action. Id. at ¶ 37. On February 26, 2014, KBR's Subcontracts Administrator, Alan Faria, informed Global Freight that KBR would return certain equipment to Global Freight and requested that Global Freight make necessary arrangements to collect the equipment. Id. at Ex. 7a. On March 9, 2014, KBR's Senior Subcontracts Administrator, Sreepreeth D. Nair, forwarded Global Freight an email he had received, stating that the Djiboutian authorities had called about additional Global Freight vehicles, and requested that Global Freight "make arrangements to receive these vehicles . . . from the camp." Id. at Ex. 7b. On April 8, 2014, Mr. Nair again emailed Global Freight informing it that "the Djiboutian Police ha[d] further summoned KBR and the U.S. Navy for the remaining

[6] The MADX143 and MADX145 Subcontracts between KBR and Global Freight are collectively referred to as the "KBR Subcontracts."

[Global Freight] vehicles under Camp Lemonnier" and as a result "the Navy has . . . directed KBR to cancel the lease effective Thursday, April 10[, 2014]." Id. at Ex. 7c. The email went on to request that Global Freight make arrangements to pick up two fuel trucks from the base, and stated that the Navy wanted Global Freight to remove another truck as well from the base on the same day. Id. Following the Navy's direction, Plaintiff moved the vehicles to its villa outside Camp Lemonnier. Id. at ¶ 38.

Djiboutian customs officials and Gendarmerie seized eight of Global Freight's vehicles from Global Freight's villa located outside Camp Lemonnier, and the Djiboutian police seized the remaining 21 of Global Freight's vehicles on March 1, 11, and April 10, 2014. Id.

In May 2014, the Djiboutian government alleged that Plaintiff had sold two items of equipment within Djibouti, but failed to pay taxes on the transactions, a violation of Djiboutian law. Id. at Ex. 8b. Global Freight disputed this allegation.

The United States and Djibouti finalized a new Base Access Agreement on or about May 5, 2014. Id. at ¶ 36, Ex. 6c.

On January 12, 2015, Global Freight and the Management of Djibouti's Customs and Indirect Duties executed an agreement to recover the confiscated vehicles. Id. at ¶ 47, Ex. 8b. Global freight paid 25 million Djiboutian francs ($140,000) to "The Management of Djibouti's Customs and Indirect Duties," for the return of its vehicles. Id. at ¶ 47. On January 26, 2015, the Djiboutian Government returned Global Freight's confiscated vehicles. Id. at ¶ 44.

## Discussion

Defendant seeks dismissal of Plaintiff's Fifth Amendment taking claim for failure to state a claim upon which relief can be granted. Defendant asserts that Plaintiff has not sufficiently alleged that its property was appropriated due to a United States governmental action. Defendant also argues that Djibouti's seizure of Plaintiff's property cannot constitute a taking because Djibouti's actions were done in the context of customs enforcement. Def.'s Mot. 7-12.

Defendant seeks dismissal of Plaintiff's alternative contract claim on the ground that this Court lacks jurisdiction over that claim pursuant to 28 U.S.C. § 1502, because Plaintiff's breach of contract claim "grow[s] out of or [is] dependent upon" an agreement between the United States and another sovereign state. Id. at 15-16. In addition, Defendant submits that Plaintiff has failed to sufficiently allege it was a third-party beneficiary of the KBR Prime Contract. Id. at 18-21.

### Subject Matter Jurisdiction

The Tucker Act, 28 U.S.C. § 1491, grants jurisdiction to the Court of Federal Claims over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (2012). Where the basis for invoking the Court's Tucker Act jurisdiction is an alleged breach of contract, a plaintiff not in privity with the Government may establish jurisdiction by demonstrating that it is an intended third-party beneficiary of the

Government contract. See Guardsman Elevator Co., Inc. v. United States, 50 Fed. Cl. 577, 580 (2001) (citing Glass v. United States, 258 F.3d 1349, 1354 (Fed. Cir. 2001)).

"The Tucker Act itself does not create a substantive cause of action . . . ." Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005). If a claim is to fall within the Court's Tucker Act jurisdiction, "a plaintiff must identify a separate source of substantive law that creates the right to money damages." Aviation & Gen. Ins. Co., Ltd. v. United States, 121 Fed. Cl. 357, 361-62 (2015) (citing Fisher, 402 F.3d at 1172). Further, the substantive law the plaintiff identifies must be "money-mandating." Id. (citing United States v. Mitchell, 463 U.S. 206, 217 (1983)). "It is well-established that the Takings Clause of the Fifth Amendment is a money-mandating source of law for purposes of Tucker Act jurisdiction." Id. at 362 (citing Jan's Helicopter Serv. Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1309 (Fed. Cir. 2008)).

Plaintiff must first establish subject-matter jurisdiction before the Court may proceed to the merits of the action. Hardie v. United States, 367 F.3d 1288, 1290 (Fed. Cir. 2004). The Court must dismiss the action if subject-matter jurisdiction is found to be lacking. Adair v. United States, 497 F.3d 1244, 1251 (Fed. Cir. 2007). The Court assumes all factual allegations as true, and will construe the complaint in a manner most favorable to the plaintiff when ruling on a motion to dismiss pursuant to Rule 12(b)(1). Pennington Seed, Inc. v. Produce Exch. No. 299, 457 F.3d 1334, 1338 (Fed. Cir. 2006). A plaintiff must establish subject-matter jurisdiction by a preponderance of the evidence. See Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988); Tindle v. United States, 56 Fed. Cl. 337, 341 (2003).

**Failure to State a Claim**

Pursuant to Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2); see Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009) (construing Rule 8 of the Federal Rules of Civil Procedure, which is identical to RCFC 8). The Government, as movant, must establish that the facts asserted by, and construed in favor of, the pleader do not entitle the pleader to a legal remedy. Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002); E&E Enters. Glob., Inc. v. United States, 120 Fed. Cl. 165, 171 (2015).

It is well settled that a complaint should be not be dismissed under Rule 12(b)(6) when a complaint contains facts sufficient to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "While a complaint attacked by a 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . [the] factual allegations must be enough to raise a right to relief above the speculative level" and cross the line "from conceivable to plausible." Id. at 555, 570 (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. This plausibility standard "is not akin to a probability requirement," but requires more than a "sheer possibility" that the defendant has violated the law. Id. (internal citation and quotation marks omitted). The issue is "not whether a plaintiff is likely to prevail ultimately, but whether [it] . . . is entitled to offer evidence to support the claims." L-3 Commc'ns Integrated Sys., L.P. v. United States, 79 Fed. Cl. 453, 466 (2007) (alterations in original) (internal citation and quotation marks omitted).

**Whether Plaintiff Has Asserted a Cognizable Takings Claim**

The Takings Clause of the Fifth Amendment of the Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. For a takings claim to survive a 12(b)(6) motion to dismiss, a plaintiff must allege sufficient facts to establish that it has a cognizable interest in the relevant property and that the property interest was "taken." Aviation & Gen. Ins. Co., 121 Fed. Cl. at 362. Further, the property must have been taken for public use. See Skip Kirchdorfer, Inc. v. United States, 6 F.3d 1573, 1583 (Fed. Cir. 1993) (concluding that maintenance of order on a military base satisfied the public purpose element of a Fifth Amendment takings claim).

Plaintiff alleges that the Navy directed Global Freight, through KBR, to "move the vehicles from the protected confines of Camp Lemonnier to Djiboutian jurisdiction, even though the Navy was well aware that Djiboutian officials had been actively disrupting the work of numerous contractors that were supporting the Navy's mission at Camp Lemonnier." Second Am. Compl. ¶ 38. Plaintiff attached to its second amended complaint a series of email communications between KBR and Global Freight, in which KBR communicated the Navy's instruction that Global Freight move its vehicles outside the confines of Camp Lemonnier. Id. at Exs. 7a-d.

"'A taking can occur simply when the Government by its actions deprives the owner of all or most of his interest in his property, and [t]here can be a taking if the Government makes it possible for someone else to obtain the use or benefit of another person's property.'" Langenegger v. United States, 756 F.2d 1565, 1570 (Fed. Cir. 1985) (alteration in original) (quoting Aris Gloves, Inc. v. United States, 420 F.2d 1386, 1391 (1970)). The United States may be held responsible for a taking under the Tucker Act, when the "final act of expropriation is by the hand of a foreign sovereign." Id. at 1571. Where the "final act of expropriation" is committed by a foreign government, the relevant inquiry becomes "whether the United States' involvement was sufficiently direct and substantial to warrant its responsibility under the fifth amendment." Id. (emphasis in original) (citing Porter v. United States, 496 F.2d 583, 591 (Ct. Cl. 1974)). And the determination of whether the Government was "substantially involved" and its actions were "sufficiently direct" depends upon two factors: 1) the nature of the United States' activity and 2) the level of the benefit the United States derived. Id.

**The Nature of the Government's Actions**

The Court's inquiry into whether Defendant is liable for a taking is focused on the nature of the U.S. Government's actions, not the actions of others. Id. at 1571 ("When considering a possible taking, the focus is not on the acts of others, but on whether sufficient direct and substantial United States involvement exists."). In assessing Government action in this context, the Federal Circuit has noted, "[d]iplomatic persuasion among allies . . . as a matter of law, cannot be deemed sufficiently irresistible to warrant a finding of direct and substantial involvement, however difficult refusal may be as a practical matter." Id. (finding "[s]uch 'nebulous forms of United States influence . . . are insufficient to make defendant constructively responsible for the taking alleged.'" (quoting Porter, 496 F.2d at 592)).

In its motion to dismiss, Defendant argues that the nature of the Navy's activity here and the "level of the benefit the United States has derived" cannot be considered "direct and substantial enough that [the Djiboutian Government's actions] may be attributed to the United States." Def.'s Mot. 8-10. Plaintiff alleges that the expropriation of its vehicles was "only accomplished due to the Navy's direct and substantial involvement because, but for the Navy's direction, the vehicles would have remained on Camp Lemonnier free from unwarranted seizure by the Djiboutian authorities." Second Am. Compl. ¶ 40.

As the Court of Claims noted, "[t]he question of whether there is a fifth amendment taking cannot turn simply on general principles of law; it must be based on the particular circumstances of each case." Aris Gloves, 420 F.2d at 1391 (citing United States v. Cent. Eureka Mining Co., 357 U.S. 155, 168 (1958)). The inquiry into the nature of the Government's action, and whether the Government's action rises to the level of a taking, is largely a factual one. The circumstances surrounding the Navy's directive and the level of United States Government involvement that lead to the Djiboutian Government's seizure of Plaintiff's vehicles are not sufficiently clear from the truncated record before the Court. Nor is it clear how "Djiboutian officials had been actively disrupting the work of numerous contractors that were supporting the Navy's mission at Camp Lemonnier" and what either the context of this disruption or the effect on the Navy's contractors was. Second Am. Compl. ¶ 38. The nature of the United States Government's alleged conduct and knowledge has not been sufficiently developed.

As the Supreme Court has recognized, "'[m]utual knowledge of all relevant facts gathered by both parties is essential to proper litigation.'" Dobyns v. United States, 91 Fed. Cl. 412, 426 (2010) (alteration in original) (quoting Hickman v. Taylor, 329 U.S. 495, 507 (1947)). Thus, "where one of the litigants is a government agency that has privileged access to information – a claimant must not be required ab initio, to aver all or nearly all the facts subservient to its claims." Id. at 426-27 (internal citation and footnote omitted). The pleading standard does not "collapse discovery, summary judgment and trial into the pleading stages of a case." Id. at 427 (quoting Petro-Hunt, LLC v. United States, 90 Fed. Cl. 51, 71 (2009)). A determination of whether the Navy's directive here falls within the ambit of nebulous conduct such as "diplomatic persuasion among allies" or of "direct and substantial involvement" requires a factual assessment which cannot be made on the basis of the allegations at this early stage of litigation.

**The Level of Benefit the United States Government Received**

Defendant further asserts that Plaintiff has failed to sufficiently allege that the taking benefited the United States. Defendant posits that the confiscation of Plaintiff's vehicles "arose as part of a customs fraud investigation against Global Freight and not in furtherance of any public purpose or benefit to the United States." Def.'s Mot. 10. However, Plaintiff did directly link the Navy's conduct in releasing its vehicles from Camp Lemonnier with a Government benefit – the Government's interest in negotiating a lease for a permanent military base in Africa. Second Am. Compl. ¶ 41. The timing and context of these negotiations support Plaintiff's claim that the Navy's directive was made to benefit the United States' ability to continue to operate the base. Plaintiff alleged that Djibouti's seizure of its vehicles took place while Camp Lemonnier was "engulfed in unrest due to Djiboutian dissatisfaction with KBR's plan to reduce support staffing at Camp Lemonnier" and while "Djiboutian air traffic controllers . . . were openly hostile to Americans . .

. and refusing to engage with American consultants hired to help improve controller performance." Id. at ¶¶ 34-35, Ex. 6b. Plaintiff further alleged that the Djiboutian government "used these actions [open hostility to Americans and refusal to engage American consultants] to force the [United States] to increase the price it paid to lease Camp Lemonnier" from $38 million to $63 million for the next 10 years. Id. at ¶ 36, Ex. 6c. Finally, Plaintiff alleged that during this period of unrest, while negotiations regarding the Base Access Agreement were ongoing, the Navy "directed the removal of [Plaintiff's] vehicles from the protected confines of Camp Lemonnier to appease the Djiboutian Government, so as not to jeopardize the United States Government's ongoing and expanding operations in Djibouti." Id. at ¶¶ 37-41.

As Plaintiff posits, "[a]bsent discovery, a reasonable inference can be drawn that the Navy ordered Global Freight's vehicles from Camp Lemonnier to appease the Djiboutian government in an effort not to disrupt the ongoing negotiations between the United States and Djibouti regarding the terms of the United States' use of Camp Lemonnier." Pl.'s Proposed Findings ¶ 16. In sum, Plaintiff has asserted a plausible Fifth Amendment taking claim, and it would be premature at this stage of litigation for the Court to draw factual conclusions about the nature of the United States Government's activity and the benefit received by the United States.[7]

**Plaintiff's Third-Party Beneficiary Claim**

In the alternative, Plaintiff alleges that Defendant breached the KBR Prime Contract under which Plaintiff was a third-party beneficiary. Plaintiff alleges that the Navy breached the KBR Prime Contract in directing Plaintiff to move its vehicles outside the confines of Camp Lemonnier and failing to invoke the disputes clause of the Base Access Agreement. Specifically, because the Navy did not invoke the disputes clause of the Base Access Agreement, Plaintiff asserts that it was forced to accept an agreement with the Management of Djibouti's Customs and Indirect Duties to recover its confiscated vehicles in exchange for 25 million Djiboutian francs. Second Am. Compl. ¶ 47.

Defendant contends that 28 U.S.C. § 1502 divests this Court of jurisdiction over Plaintiff's third-party beneficiary breach of contract claim because Plaintiff's claim grows out of or depends on the terms of the Base Access Agreement. Def.'s Mot. 12. Section 1502 provides that "[e]xcept

---

[7] Defendant also asserts that "[e]ven if Djibouti's actions could be attributed to the United States, those actions do not give rise to a takings claim" because they essentially constituted a seizure under Djibouti's customs laws. Def.'s Mot. 10. Defendant reasons that because under United States forfeiture law government seizures do not constitute a taking, Djibouti's acts, enforcing its own laws, also cannot constitute a taking. Id. (citing Acadia Tech., Inc. v. United States, 458 F.3d 1327, 1331-32 (Fed. Cir. 2006)). In so arguing, Defendant improperly attempts to shift the focus to the Djiboutian government's conduct in seizing the vehicles. However, that is not the governmental conduct Plaintiff challenges here. Plaintiff alleges that it was the Navy's conduct in releasing its vehicles into Djiboutian territory, knowingly putting the vehicles at risk to facilitate maintaining a base in Djibouti that constituted the taking. Where a third party is responsible for the final expropriation of a plaintiff's property, the Court's inquiry is focused on the nature of the United States Government actions rather than those of the third party. See Langenegger v. United States, 756 F.2d 1565, 1571 (Fed. Cir. 1985).

as otherwise provided by Act of Congress, the United States Court of Federal Claims shall not have jurisdiction of any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations." 28 U.S.C. § 1502 (2012). The parties do not dispute that the Base Access Agreement falls within the court's broad interpretation of the term "treaty" under § 1502. See Hughes Aircraft Co. v. United States, 534 F.2d 889, 903 n.17 (Cl. Ct. 1976). As the Claims Court explained:

> [T]his court has in the past equated international executive agreements with treaties for purposes of Section 1502. The reason for this equation is that the fundamental separation-of-powers policy underlying [section] 1502, i.e., to avoid undue judicial interference (e.g., by construction of particular treaty terms and provisions) with the Executive Branch's conduct of foreign relations, is equally applicable to both forms of international compact.

Id. (internal citations omitted).

The Court is then left to examine whether Plaintiff's third-party beneficiary claim "grows out of" or is "dependent upon" the Base Access Agreement. Section 1502 divests the Court of jurisdiction where "the right itself, which the petition makes to be the foundation of the claim . . . [has] its origin – derive[s] its life and existence – from some treaty stipulation." United States v. Weld, 127 U.S. 51, 57 (1888); Hughes Aircraft Co., 534 F.2d at 903-04 ("The test under § 1502 is whether plaintiff's claim could conceivably exist independently of, or separate and apart from, the subject treaty, or whether on the contrary, it derives its existence so exclusively and substantially from certain express terms or provisions thereof, that consideration of the claim would necessitate our construction of the treaty itself."). As the Supreme Court noted, where there is a "direct and proximate connection between the treaty and the claim" § 1502 divests the Court of jurisdiction. Weld, 127 U.S. at 57.

Conversely, the Court retains jurisdiction where a claimant does not seek relief based upon a treaty or the enforcement of a treaty provision, but rather asks that "the court exercise[] its juridical power to construe" contract provisions "explicitly drafted to satisfy and incorporate the international understanding." See Per Aarsleff A/S v. United States, 121 Fed. Cl. 603, 622 (2015), rev'd on other grounds, 829 F.3d 1303 (Fed. Cir. 2016). Plaintiff contends that its claim is predicated on the KBR Prime Contract.

Before tackling the thorny issue of whether Section 1502 divests this Court of jurisdiction, the Court must first determine whether Plaintiff has established that it is a third-party beneficiary of the KBR Prime Contract. Whether Plaintiff is a third-party beneficiary presents a jurisdictional issue, because "[a]s a general rule, the Tucker Act does not provide the court with jurisdiction to hear a claim brought directly against the federal government by a subcontractor." G4S Tech. LLC v. United States, 114 Fed. Cl. 662, 669 (2014), aff'd, 779 F.3d 1337 (Fed. Cir. 2015). However, an exception to this rule permits an intended third-party beneficiary of a government contract to directly sue the federal government. Id. Thus, Plaintiff must show that it is a third-party beneficiary of the KBR Prime Contract for this Court to have jurisdiction over Plaintiff's breach of contract claim.

The Federal Circuit has recently addressed the requirements for establishing third-party beneficiary status, stating:

> A nonparty becomes legally entitled to a benefit promised in a contract . . . only if the contracting parties so intend. This intent may be either express or implied, and it must be fairly attributable to the contracting officer. In addition, the benefit to the third party must be direct. The Supreme Court has recognized the exceptional privilege that third-party beneficiary status imparts, and we have accordingly cautioned that the privilege of third party beneficiary status should not be granted liberally.
>
> * * *
>
> In the absence of clear guidance from the contract language, the requisite intent on the part of the government can be inferred from the actions of the contracting officer and circumstances providing the contracting officer with appropriate notice that the contract provision at issue was intended to benefit the third party.

G4S, 779 F.3d at 1340 (alteration in original) (internal citations and quotation marks omitted).

Plaintiff contends that the questions and answers incorporated into the KBR Prime Contract demonstrate "that the Navy expected KBR to perform the KBR Prime Contract in accordance with the terms of the Base Access Agreement, and that KBR [and its subcontractors were] entitled to rely upon the contractor protections [such as tax exemptions] secured by the Base Access Agreement in that performance." Pl.'s Proposed Findings ¶ 50. Plaintiff also alleges that the Navy's provision of tax exoneration letters congruent with the terms of the Base Access Agreement, pursuant to the PAE Prime Contract and the Base Access Agreement's definition of U.S. Contractors, further demonstrates the Navy's intent that the protections of the Base Access Agreement extended to Plaintiff as KBR's subcontractor. Id. at ¶ 51. Finally, Plaintiff asserts that it was "reasonable in relying on the promise of the KBR Prime Contract with respect to the protections of the Base Access Agreement as manifesting an intention to confer a right on [Plaintiff]," because Plaintiff had availed itself of the protections of the Base Access Agreement by obtaining from the Navy tax exoneration letters congruent with the terms of the Agreement while serving as a subcontractor under the preceding PAE Prime Contract. Id. at ¶ 52 (internal citations and quotation marks omitted).

In its opposition to Defendant's motion to dismiss, Plaintiff asserts that it requires discovery to provide the Court "a proper factual foundation" for the examination of Plaintiff's claim that it is a third-party beneficiary of the KBR Prime Contract. Pl.'s Opp'n 18. The Court agrees that it is appropriate to permit discovery on this issue. Although "the appropriate test for third party beneficiary status is a question of law," the "underlying question of whether [Plaintiff] is a third party beneficiar[y] to the alleged contract is a mixed question of law and fact." Glass v. United States, 258 F.3d 1349, 1353 (Fed. Cir. 2001).

## Conclusion

Defendant's motion to dismiss Plaintiff's second amended complaint is **DENIED**.

Defendant shall file an answer to Plaintiff's second amended complaint by **December 14, 2016**, in accordance with RCFC 12(a)(4)(A)(i).

The Court will conduct a telephonic conference to discuss discovery and scheduling on **December 21, 2016**, at **11:00 a.m. E.S.T.** The Court will initiate the call.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**